# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 14-153** |
| **PHILIPS THOMPSON, ET AL.** | **SECTION: "E" (4)** |

## ORDER AND REASONS

Before the Court are motions by the Defendants in this criminal matter: (1) Philips Thompson's re-urged motion to suppress made during his trial and his post-trial Renewed Motion to Suppress and for Judgment of Acquittal or New Trial;[1] (2) Akari Williams' Motion for Judgment of Acquittal and/or New Trial;[2] and (3) Kerry Lirette's Motion to Reconsider the Court's Ruling on the Motion to Suppress Evidence.[3] The Government opposes these motions.[4]

## BACKGROUND

On July 25, 2014, Defendants Akari Williams and Kerry Lirette, Jr. were charged by indictment with one count of conspiracy to distribute and to possess with the intent to distribute 500 grams or more of methamphetamine.[5] On February 27, 2015, a superseding indictment was filed naming as Defendants Akari Williams, Kerry Lirette, Jr., and Philips Thompson. The superseding indictment charges all three defendants with conspiracy to distribute and to possess with the intent to distribute 500 grams or more of methamphetamine.[6] The superseding indictment also charges Thompson with

---

[1] R. Doc. 240.
[2] R. Doc. 242.
[3] R. Doc. 264. The original motion to reconsider was filed on December 19, 2016 but was marked deficient. *See* R. Doc. 238.
[4] R. Doc. 251.
[5] R. Doc. 1.
[6] R. Doc. 36.

distribution of 500 grams or more of methamphetamine and Williams and Lirette with possession with intent to distribute 500 grams or more of methamphetamine. The Court granted a motion to sever the trial of Lirette from the other two co-defendants.[7]

On February 23, 2016, Thompson filed a motion to suppress all evidence, and any fruits thereof, obtained (1) through the May 27, 2014, search of a package, and (2) through the July 22, 2014, seizure of Thompson's cell phone.[8] On May 2, 2016, Lirette moved to adopt Thompson's motion but only with respect to the May 27, 2014 package search.[9] The Court held a suppression hearing on May 4, 2016.[10] On June 27, 2016, the Court issued its Order and Reasons denying the motions to suppress.[11]

During the trial, Thompson orally reurged his motion to suppress. At that time Williams' counsel attempted to join Thompson's renewed motion to suppress. After a four day jury trial,[12] Thompson and Williams were convicted as to all counts by jury verdict dated November 10, 2016.[13] On December 19, 2016, Thompson filed his Renewed Motion to Suppress and for Judgment of Acquittal or New Trial.[14] On December 20, 2016, Williams filed his Motion for Judgment of Acquittal and/or New Trial.[15] On March 27, 2017, Lirette filed a Motion to Reconsider the Court's Ruling on the Motion to Suppress Evidence.[16] On January 23, 2017, the Government filed its response in opposition as to

---

[7] R. Doc. 119.
[8] R. Doc. 67.
[9] R. Docs. 87, 94, 98.
[10] R. Doc. 105; R. Doc. 251-4.
[11] R. Doc. 118.
[12] R. Doc. 206; R. Doc. 209; R. Doc. 211; R. Doc. 213.
[13] R. Doc. 217. Defendant Lirette's trial is presently scheduled to begin on January 8, 2018. R. Doc. 287.
[14] R. Doc. 240. The Court had previously granted Thompson and Williams' motions for an extension of time to file post-trial motions. R. Doc. 226 (setting the deadline for the Defendants to file post-trial motions by December 19, 2016).
[15] R. Doc. 242. Although the deadline to file post-trial motions was December 19, 2016, the Court considers Williams' motion as timely because he had previously filed a timely post-trial motion that was marked deficient. *See* R. Doc. 239.
[16] R. Doc. 264.

all three Defendants' motions.[17] The Court held oral argument on the Defendants' motions on March 22, 2017.[18]

## STANDARDS OF LAW

### I. Motions for Judgment of Acquittal

A motion for judgment of acquittal under <u>Federal Rule of Criminal Procedure 29</u> "is a challenge to the sufficiency of the evidence to sustain a conviction."[19] When considering the sufficiency of the evidence, the court must determine whether "a rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt."[20] The court determines "only whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence."[21] "[I]f the fact finder was presented with sufficient evidence to support the verdict reached, that verdict must be upheld."[22] "All reasonable inferences which tend to support the Government's case must be accepted. Any conflicts in the evidence must be resolved in the Government's favor."[23]

---

[17] R. Doc. 251. Although Lirette had not yet filed a non-deficient motion at the time the Government filed its response in opposition, the Government, out of an abundance of caution, responded to the arguments made in Lirette's motion. *See id.* at 1.

[18] R. Doc. 263.

[19] <u>United States v. Brown</u>, No. 2:10-CR-00291, 2012 WL 273163, at *2 (W.D. La. Jan. 26, 2012) (citing <u>United States v. Uvalle-Patricio</u>, 478 F.3d 699, 701 (5th Cir. 2007)). "A Rule 29 motion for acquittal tests only the sufficiency of the evidence introduced at trial to support the crime charged." <u>United States v. Age</u>, No. 11-105-JJB, 2013 WL 3245215, at *1 (M.D. La. June 26, 2013).

[20] <u>United States v. Miles</u>, 360 F.3d 472, 476 (5th Cir. 2004). *See also* <u>United States v. Age</u>, 2013 WL 3245215, at *1.

[21] <u>United States v. Dean</u>, 59 F.3d 1479, 1484 (5th Cir. 1995) (citations omitted).

[22] <u>United States v. Lucio</u>, 428 F.3d 519, 522 (5th Cir. 2005). *See also* <u>United States v. Mack</u>, No. 15-61-SDD-SCR, 2016 WL 740280, at *1 (M.D. La. Feb. 24, 2016). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." <u>United States v. Jaramillo</u>, 42 F.3d 920, 923 (5th Cir. 1995).

[23] <u>United States v. Burns</u>, 597 F.2d 939, 940–41 (5th Cir. 1979) (citations omitted).

## II.     Motions for a New Trial

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[24] "The power to grant a new trial should be exercised infrequently by district courts, unless warranted by exceptional circumstances."[25] As such, motions for a new trial must be "based either on the grounds that the verdict was against the great weight of the evidence or that some error was committed by the court or the prosecution which substantially affect[ed] the rights of the accused."[26] An error substantially affects the rights of the accused if "it affected the outcome of the trial court proceedings."[27]

## III.     Motions to Suppress

The Fourth Amendment expressly imposes two requirements: (1) all searches and seizures must be reasonable, and (2) "[a] warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."[28] "Warrantless searches are presumptively unreasonable."[29] The exclusionary rule forbids the use of evidence obtained in violation of the Fourth Amendment.[30] The rule prohibits such use "not because the evidence is not probative, or to chastise errant law officers or to benefit the accused, but to compel respect for the guaranty of the Fourth Amendment 'in the only effectively available way—by removing

---

[24] FED. R. CRIM. P. 33(a).

[25] *United States v. Abdallah*, 629 F. Supp. 2d 699, 731 (S.D. Tex. 2009) (quoting *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (internal quotation marks and citations omitted)).

[26] *United States v. Mix*, No. 12-171, 2014 WL 2625034, at *1 (E.D. La. June 12, 2014) (quoting *United States v. Simms*, 508 F. Supp. 1188, 1202 (W.D. La. 1980)).

[27] *United States v. Alarcon*, 261 F.3d 416, 423 (5th Cir. 2001). *See also United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005); *United States v. Kuyrkendall*, No. 3:09cr18-DPJ-LRA, 2009 WL 3230864, at *1 (S.D. Miss. Oct. 2, 2009)) ("A trial court's error in charging a jury is an error subject to harmless-error analysis.").

[28] *Kentucky v. King*, 563 U.S. 452, 459 (2011).

[29] *United States v. Villarreal*, 963 F.2d 770, 773 (5th Cir. 1992).

[30] *United States v. Otero*, 176 F.3d 479 (5th Cir. 1999) (per curiam).

the incentive to disregard it.'"[31] Accordingly, "where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'"[32]

As a general rule, the proponent of a motion to suppress must prove by a preponderance of the evidence that the evidence in question was obtained in violation of his or her Fourth Amendment rights.[33] In the case of a warrantless search or seizure, the burden shifts to the Government to prove by a preponderance of the evidence that its actions were constitutional.[34]

## IV. Motions to Reconsider

The standard for a motion for reconsideration in the criminal arena is not well-established in the Federal Rules. Nevertheless, it is well established that "a district court's authority to consider anew a suppression motion previously denied is within its sound judicial discretion."[35] Another federal district court in Louisiana, relying on decisions in other circuits, found that a motion for reconsideration can be made on three grounds: (1) an intervening change in controlling law that has occurred since the Court's earlier ruling; (2) evidence not previously available has become available; or (3) reconsideration is necessary to correct a clear error of law or fact or prevent a manifest injustice.[36]

---

[31] *United States v. Ragsdale*, 470 F.2d 24, 30 (5th Cir. 1972) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)).
[32] *Davis v. United States*, 564 U.S. 229, 237 (2011) (alteration in original) (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)).
[33] *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014).
[34] *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).
[35] *United States v. Raddatz*, 447 U.S. 667, 678 n.6 (1980).
[36] *United States v. Banks*, 2012 WL 3862433, at *2 (M.D. La. Sept. 5, 2012).

# ANALYSIS

## V. Motions to Suppress

### A. Pending Motions to Suppress

On February 23, 2016, Thompson filed a pre-trial motion to suppress all evidence, and any fruits thereof, obtained (1) through the May 27, 2014 search of a package, and (2) through the July 22, 2014, seizure of his cell phone.[37] On May 2, 2017, Lirette adopted Thompson's motion to suppress with respect to the May 27, 2014 package search.[38] On May 5, 2016, Lirette filed a Memorandum of Law with respect to his standing to join the motion to suppress.[39] On June 27, 2016, the Court issued its Order and Reasons denying the motions to suppress.[40]

Following the presentation of the Government's evidence, and again after the close of the defense's case, Thompson re-urged his suppression motion. Although Williams did not file a pretrial motion to suppress, Williams' counsel, on the record, attempted to join Thompson's *renewed* motion to suppress. The Court deferred ruling on Thompson's renewed motion to suppress until after the jury's verdict in order to provide the parties and the Court sufficient time to brief and consider the issue. The Court further instructed the parties to address the issue of suppression in their post-trial motions.

On December 19, 2016, Thompson filed a Renewed Motion to Suppress and for Judgment of Acquittal or New Trial.[41] On March 27, 2017, Lirette filed a Motion for Reconsideration of the Court's ruling on the motions to suppress.[42]

---

[37] R. Doc. 67.
[38] R. Docs. 87, 94.
[39] R. Docs. 98.
[40] R. Doc. 118.
[41] R. Doc. 240.
[42] R. Doc. 264.

## B. Timeliness of the Motions to Suppress

Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure requires a defendant to file a motion to suppress before trial so long as the basis for the motion is reasonably available and the motion can be determined without a trial on the merits.[43] The Fifth Circuit has explicitly "recognized that a district court may reject a tardy suppression motion *solely on the grounds of its untimeliness.*"[44] Rule 12(c)(3) of the Federal Rules of Criminal Procedure; however, includes a provision allowing, for good cause, the court to grant relief to a defendant who has not timely asserted his right to file a 12(b)(3) motion.[45] Although the Federal Rules of Criminal Procedure do not state that a defendant waives his ability to file a motion to suppress by not timely filing a motion before the beginning of a trial on the merits, the rules do explicitly require that the defendant provide "good cause" for his untimeliness.[46]

### 1. Akari Williams Did Not Timely File a Pre-Trial Motion to Suppress.

Williams did not file a pretrial motion to suppress. At trial, Williams' counsel stated on the record that he wished to join his co-Defendant's *renewed* motion. The Court did not rule at that time on Williams' right to join in Thompson's renewed motion to suppress given that Williams did not timely file his own pre-trial motion to suppress. Although he styled his post-trial motion as one for acquittal and/or for new trial, in reality his request for a new trial is based in large part on his untimely motion for suppression of

---

[43] FED. R. CRIM. P. 12(b)(3).

[44] *United States v. Chavez-Valencia*, 116 F.3d 127, 131 (5th Cir. 1997).

[45] FED. R. CRIM. P. 12(c)(3). *See also Phengsengkham v. U.S.*, 2012 WL 3062232, at *8 (N.D. Tex. June 27, 2012) (explaining Federal Rule of Criminal Procedure Rule 12(e) which, after the 2014 amendments to the rules, was relocated from (e) to (c)(3)). *See also United States v. Soto*, 794 F.3d 635, 647-56 (6th Cir. 2015) (providing an in-depth analysis into the 2014 Amendments to Rule 12 of the Federal Rules of Criminal Procedure).

[46] *See* FED. R. CRIM. P. 12(c)(3). *See also Soto*, 794 F.3d at 647-56.

evidence. Williams failed to timely file a motion to suppress and has failed to show "good cause" as to why the Court should consider his untimely motion to suppress.

In his post-trial motion filed on the record, Williams argues that, although he did not file his own motion to suppress prior to trial, his trial counsel "made an oral motion to adopt all pleadings filed by co-defendants during the pendency of the case."[47] Williams argues this is sufficient to show that he "effectively joined in the pretrial motion to suppress filed by" co-Defendant Thompson.[48] Accepting Williams' argument that he "effectively joined" a pretrial motion *during* the trial would allow him to circumvent the requirement of the Federal Rules of Criminal Procedure that a defendant file a motion to suppress before trial so long as the basis for the motion is reasonably available and the motion can be determined without a trial on the merits. Williams makes no effort to demonstrate good cause for his untimeliness and the Court finds there is none. Well before trial, Williams was aware that the package was opened, and that the evidence collected during, and as a result of, that search would be used to establish his involvement in the charged conspiracy. Williams and his counsel were, or should have been, aware of Thompson's and Lirette's suppression motions and the hearing the Court held on May 4, 2016, given the large number of filings related to the motion on the record. Because Williams was fully aware of the facts upon which the suppression motion was based, and because he otherwise offers no reason for his untimely filing, there is no "good cause" for the Court to consider his post-trial suppression motion.[49]

---

[47] R. Doc. 242-1 at 4.

[48] *Id.*

[49] *United States v. Wilson*, 115 F.3d 1185, 1191 (4th Cir. 1997) (finding lack of good cause where "[t]he record shows that sufficient information was available to defense counsel before trial that would have enabled him to frame his suppression motion to include the execution of the search warrant."); *United States v. Harrelson*, 705 F.2d 733, 738 (5th Cir. 1983) (no good cause where "[n]o explanation or excuse was offered for the untimely filing. There was no showing that the affiant or the information was not available.").

## 2. Philips Thompson and Kerry Lirette's Original and Renewed Motions to Suppress were Timely Filed.

Thompson and Lirette timely filed pre-trial motions to suppress the evidence obtained during, and as a result of, the search of the package.[50] Following the presentation of the Government's evidence, and again after the close of the defense's case, Thompson properly preserved his right to renew his suppression motion. The Court deferred ruling on Thompson's renewed motion to suppress until after the jury's verdict in order to provide the parties and the Court sufficient time to brief and consider the issue.

## C. Reconsideration of the Motions to Suppress filed by Thompson and Lirette

Ordinarily, when a motion to suppress is denied before trial, "the defendant may not relitigate the suppression issue at trial."[51] "Occasions will arise, however, when a pretrial denial of a motion to suppress is not binding upon the trial judge."[52] A district court's decision to reconsider a motion to suppress is within the court's discretion.[53] A motion for reconsideration of a motion to suppress can be made on only three grounds: (1) an intervening change in controlling law that has occurred since the Court's earlier ruling; (2) evidence not previously available has become available; or (3) reconsideration is necessary to correct a clear error of law or fact or prevent a manifest injustice.[54] "If new facts come to light at trial, the trial judge in the exercise of his discretion may consider anew the suppression issue."[55]

---

[50] R. Docs. 67, 87.
[51] _United States v. Montos_, 421 F.2d 215, 220 (5th Cir. 1970).
[52] _Id._
[53] _United States v. Chavez-Valencia_, 116 F.3d 127, 131 (5th Cir. 1997).
[54] _United States v. Banks_, 2012 WL 3862433, at *2 (M.D. La. Sept. 5, 2012).
[55] _Montos_, 421 F.2d at 220.

The Court finds that a clear error of law was made with respect to Thompson's standing to seek suppression of the evidence seized through, and as a result of, the search of the package.[56] Furthermore, new evidence was introduced at trial that calls into question the propriety of the Court's previous ruling, as well as the Court's ruling on Thompson's and Lirette's challenges to the constitutionality of the search. The Court exercises its discretion to reconsider its rulings with respect to Thompson's standing to move to suppress evidence and the constitutionality of the search of the package.

### D. The Defendants' "Standing" Under the Fourth Amendment

#### 1. Akari Williams Lacks Standing to Challenge the Search of the Package Under the Fourth Amendment.

The Court has found that Williams failed to file a pre-trial motion to suppress and has failed to show good cause why the Court should consider his untimely filed request. Even if the Court were to consider Williams' motion to suppress as timely, the Court finds that Williams does not have Fourth Amendment standing to seek suppression of the evidence resulting from, or as a result of, the search of the package. The Fourth Amendment permits only those whose reasonable expectations of privacy have been violated to seek suppression of evidence. A defendant seeking suppression has the burden of establishing he has standing under the Fourth Amendment.[57] That is, the defendant must show "that he has a privacy or property interest in the premises searched or the items seized which is sufficient to justify a reasonable expectation of privacy therein."[58] It

---

[56] *Id.* (internal citations omitted).

[57] *United States v. Iraheta*, 764 F.3d 455, 461 (5th Cir. 2014) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."); *United States v. Wilson*, 36 F.3d 1298, 1302 (5th Cir. 1994); *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

[58] *United States v. Pierce ("Pierce II")*, 959 F.2d 1297, 1303 (5th Cir. 1992) (internal quotation marks omitted).

is firmly established that Fourth Amendment rights are personal and may not be vicariously asserted.[59] Courts apply a two-pronged inquiry to assess whether a defendant has standing: "[A] defendant's standing [under the Fourth Amendment] depends on (1) whether the defendant is able to establish an actual, subjective expectation of privacy with respect to the place [or object] being searched or items being seized, and (2) whether that expectation of privacy is one which society would recognize as objectively reasonable."[60] "Such an expectation of privacy is a threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis."[61]

"The Supreme Court has long recognized that '[l]etters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy.'"[62] "Both senders and addressees of packages or other closed containers can reasonably expect that the government will not open them."[63] In *United States v. Pierce*, the Fifth Circuit explained, "Arguably, a defendant who is neither the sender nor the addressee of a package has no privacy interest in it, and, accordingly, no standing to assert Fourth Amendment objections to its search."[64] In *Pierce*, it was uncontested that a package containing cocaine was neither sent by nor addressed to the defendant.[65]

---

[59] *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).

[60] *Iraheta*, 764 F.3d at 461 (internal quotation marks omitted).

[61] *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir. 1994).

[62] *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992) (citing *United States v. Jacobsen*, 466 U.S. 109 (1984); *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970); *Ex Parte Jackson*, 96 U.S. 727, 733 (1878)) (alteration in original).

[63] *Id.* (citations omitted).

[64] *Pierce II*, 959 F.2d at 1303. *See also United States v. Colon-Solis*, 508 F. Supp. 2d 186, 192 (D.P.R. 2007) ("Conversely, a defendant who is neither the sender nor the addressee of a package has no privacy interest in it and accordingly cannot assert a Fourth Amendment objection to its search.") (citing *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988)).

[65] *Pierce II*, 959 F.2d at 1303.

Williams acknowledges that he was neither the sender nor the addressee of the package.[66] If the package had been addressed to Williams, "it is no doubt true that . . . [he] would have had a legitimate expectation of privacy in its contents."[67] In fact, Williams' standing argument would be significantly stronger had the package been addressed to a fictitious person or entity that was Williams' *alter ego*.[68] Instead, similar to *Givens*, the package was addressed to an actual person, Williams' co-Defendant, Kerry Lirette, Jr. Similar to the petitioners in *Givens*, Williams argues that his standing "arises from [his] status as [the] intended recipient[] of the [methamphetamine] in the package, and from the significant precautions taken to preserve the secrecy of the package's contents."[69] As the Fourth Circuit in *Givens* explained:

> Defendants cite no direct authority for the proposition that when A sends a package to B, the contents of which are ultimately intended for C, that C is entitled to claim a privacy interest in the contents of the package. Nor do we think this argument is tenable on its merits. Even assuming that defendants had some possessory interest in the cocaine, for which they had apparently not yet paid, that interest did not broaden to encompass the mailing envelope and cassette. This situation is analogous to claims that one has a legitimate expectation of privacy in the trunk of another's car, or in another's purse. In all these circumstances the owner of the container controls the use of and access to the area as a depository for the property of others; as the Supreme Court noted in *Rakas*, the right to exclude others affords a significant indicator of whether one has a legitimate expectation of privacy in the area. Defendants here effectively relinquished control over the area in which the drugs they claim an interest in were secreted. Once police had arranged for the opening of the mailing envelope and cassette, it was as though the cocaine had been found in plain view. And as *Rawlings* makes clear, a defendant can claim no legitimate expectation of privacy in drugs found in plain view, regardless of whether he has any ownership interest in the contraband.[70]

---

[66] R. Doc. 242-1 at 5.
[67] <u>United States v. Givens</u>, 733 F.2d 339, 341 (4th Cir. 1984).
[68] *See id.* ("But that is not the situation. Defendants here are claiming a privacy interest in the contents of a package addressed neither to them nor to some entity, real or fictitious, which is their *alter ego*, but to actual third parties[.]").
[69] *Id.*
[70] *Id.* at 342 (internal citations omitted).

The Fifth Circuit, citing *Givens*, also has found that a defendant's assertion alone that he was the intended recipient of the contents of the package does "not confer a legitimate expectation of privacy" when the package was addressed to, and received, by another person.[71]

Other federal district courts addressing similar facts have reached the same conclusion. For example, in *United States v. Colon-Solis*, the court, relying in part on *Givens*, explained that even if the defendant "was the intended recipient of the box, this does not confer a legitimate expectation of privacy because it was addressed to and intended to be received by another individual."[72] That court found that the defendant "effectively transferred his interest in the box" when he designated an *actual third party* as the addressee of the package.[73] The court further explained that, although the defendant did not have a privacy interest in the package at the time it was seized, there was still some support for his ownership of the contents contained inside the package.[74] However, "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of this Court's inquiry."[75] In *Colin-Solis* the court found that, although the defendant likely had constructive possession over the contents contained inside the package, "neither this ownership interest nor this possessory interest extended to the shipping container itself – namely the box" used to send the items at issue."[76] The court ultimately concluded that "[b]y addressing the package to a third

---

[71] *See Pierce II*, 959 F.2d at 1303.
[72] *United States v. Colon-Solis*, 508 F. Supp. 2d 186, 192 (D.P.R. 2007) (citations omitted).
[73] *Id.*
[74] *Id.* at 193.
[75] *Id.* (quoting *United States v. Salvucci*, 448 U.S. 83, 91 (1980)).
[76] *Id.*

person, [the defendant] effectively relinquished control over the area in which the contraband [he] claimed an interest in was secreted. Thus, while [the defendant's] possessory interest in the [contents] may continue, he forfeited any ownership or possessory interest in its container."[77]

At trial, the Government introduced evidence that Thompson, using an alias, sent the package containing the methamphetamine to Lirette, not Williams. Law enforcement officials executed a controlled delivery of the package to the residence Lirette rented from Williams, the owner of the house. After receiving the package, Lirette then headed to Williams' residence where the two proceeded to open the package.

Williams concedes he was not the addressee on the package, but argues the Government produced evidence that (1) the package was shipped to property he owns; and (2) tracking data for the package was found on his cell phone. [78] In essence, Williams argues he has standing because he was the intended recipient of the contents of the package. As explained above, the Fifth Circuit in *Pierce II*, and other courts addressing the same argument, have rejected the notion that a defendant, who is neither the sender nor addressee, may assert standing in a package sent by common carrier based on the premise that he is the intended recipient of the contents of the package. [79]

To circumvent the clear case law on this point, Williams argues that his standing is based on two premises: (1) the package was shipped to a property he owns; and (2) the government argued at trial that the tracking data for the package found on his cell phone proved that he knew the package was being sent, knew its contents, and had an ownership

---

[77] *Id.*
[78] Govt. Exhibits 2, 5, and 6A.
[79] *See Pierce II*, 959 F.2d at 1303. *See also Givens*, 733 F.2d at 341.

interest in the package.[80] With respect to Williams' first argument, a "property owner has no expectation of privacy if the property is leased."[81] As a result, even if the Court were to find that a privacy interest in the home where the package was delivered would ordinarily be sufficient to confer standing to challenge the search of the package, Williams still would not have standing because, in leasing the home to Lirette, Williams relinquished his expectation of privacy in the home.[82]

With respect to Williams' second argument, Williams argues that, because the Government introduced evidence regarding the tracking data on his cell phone to prove his guilt, he has standing to challenge the search.[83] This is nothing more than a rehashing of Williams' claim that he has standing because he was the intended recipient of the contents of the package. As explained above, the decisions are clear that a defendant does not have a privacy interest in a package merely because he is the intended recipient of the contents *inside* the package.

Accordingly, the Court finds that, even if Williams had timely raised his motion to suppress, Williams' motion to suppress all evidence, and any fruits thereof, obtained through the May 27, 2014 search of the package must be denied. Because Williams had no legitimate expectation of privacy in the package, he lacks standing to challenge the search under the Fourth Amendment.

---

[80] R. Doc. 242-1 at 4-5.
[81] *Dearmore v. City of Garland*, 400 F. Supp. 2d 894, 900 (N.D. Tex. 2005) (citing *United States v. Dyer*, 574 F.2d 1385, 1390 (5th Cir. 1978)).
[82] *See id.* (explaining, "If, however, the rental property is not occupied, the only logical person who would have standing and an expectation of privacy would be the owner of the property.").
[83] R. Doc. 242-1 at 4-5.

### 2. Philips Thompson Has Standing to Challenge the Search of the Package Under the Fourth Amendment.

In his pre-trial motion to suppress, Thompson did not address whether or not he had standing to contest the search of the package and instead focused on the warrantless search being unconstitutional because the UPS store owner, Tarango, was acting as the government's agent.[84] In its opposition to Thompson's pre-trial motion to suppress, the Government questioned Thompson's standing but only because he used an alias when he mailed the package.[85]

The Court recognized that the parties did not address Thompson's subjective expectation of privacy pre-trial. In its June 27, 2016 Order and Reasons denying Thompson's pre-trial motion to suppress, the Court explained, "Although the Government and Thompson dispute whether any expectation of privacy Thompson may have had was objectively reasonable, neither addresses whether Thompson had an actual, subjective expectation of privacy."[86] The Court, reasoning that it was Thompson's burden to establish his subjective expectation of privacy, found that his failure to do so[87] was fatal to his motion to suppress.[88] The Court further found that "Thompson 'failed to assert [a reasonable expectation of privacy] in support of [his] motion to suppress,' as he did not

---

[84] R. Doc. 67-1 at 6-11.

[85] R. Doc. 80 at 5-8.

[86] R. Doc. 118 at 10. The Court added, "The Government does not[e] that Thompson 'forfeited his standing to challenge any search [of the package]' because he 'intentionally distanced himself from the package' to 'obscure his identity as the sender and avoid criminal liability.' R. Doc. 80 at 5. The Government also noted, '[a]s the mailer of this package, he could have asserted his control and ownership, but chose not to do so.' *Id.* Although the Government later argues that, '[a]ny subjective expectation of privacy is not one that society deems reasonable,' *id.* at 8, the Government never addresses whether Thompson had an actual, subjective expectation of privacy in the package." *See id.* at n.86.

[87] Despite the fact that the Supreme Court has held a defendant's testimony at a suppression hearing cannot be used as evidence of guilt at trial, Thompson did not testify at his pre-trial suppression hearing. *See United States v. Simmons*, 390 U.S. 377 (1968).

[88] R. Doc. 118 at 12-13.

concede he sent the package or 'had *any involvement* in the underlying conduct alleged by the Government.'"[89]

Thompson now argues post-trial that he does have standing based on three arguments: (1) Thompson, in order to satisfy his burden to establish his standing, was not required to address the subjective prong during the pre-trial hearing because the Government had already conceded this point; (2) the Government, at trial, submitted extensive evidence that Thompson was in fact the package's sender, and based its case against him before the jury exclusively on that theory;[90] and (3) Thompson now concedes that he was, in fact, the sender of the package.[91]

Thompson argues that his decision not to testify at the suppression hearing, and for that matter, not to admit that he sent the package, was based, at least in part, on his assertion that he "did not believe at the time that [he] had to establish a fact that the Government was already conceding and was in fact making a central part of its case."[92] In effect, Thompson argues that the Government, by arguing that he sent the package, conceded that Thompson had a reasonable expectation of privacy. The Government argues that Thompson's decision not to testify was a reasoned tactic given that a defendant's testimony at a suppression hearing may be used for impeachment purposes if the defendant chooses to testify at trial and testifies inconsistently.[93]

---

[89] *Id.* at 13 (emphasis in original) (citations omitted).

[90] The Government presented evidence at the suppression hearing and the trial that Thompson mailed the package.

[91] *See* R. Docs. 240-1 at 6, 260 at 1, 266 at 1.

[92] R. Doc. 266 at 2. Thompson also states that any "potentially contrary statement" in his reply brief "was simply an overly cautious attempt by [counsel] not to be locked into a later stipulation for trial, not any sort of gamesmanship by [counsel]." R. Doc. 240-1 at 11 n.3.

[93] R. Doc. 251 at 13-14 (citing *United States v. Gomez-Diaz*, 712 F.2d 949, 952 n.1 (5th Cir. 1983) ("A defendant at a suppression hearing may testify without fear that the testimony will be used against him at trial except for impeachment.")).

In its opposition to Thompson's re-urged motion to suppress, the Government asserts that it "has consistently argued that Thompson mailed the package, but that he subsequently disassociated himself from it."[94] The Government's sole basis for its argument that Thompson did not have a subjective expectation of privacy in the package continues to be that he used an alias when he mailed the package.

The basis of the Government's argument is legally incorrect. As explained above, "The Supreme Court has long recognized that '[l]etters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy.'"[95] "Both senders and addressees of packages or other closed containers can reasonably expect that the government will not open them."[96]

In *Villarreal*, the Fifth Circuit explained, "this court has made clear that individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names."[97] Thompson argues, and the Court agrees, "There is no reason why the same would not be true for packages *sent* under fictitious names."[98] In *United States v. Pitts*, the Seventh Circuit found, "There is nothing inherently wrong with a desire to remain anonymous when sending or receiving a package, and thus the expectation of privacy for a person using an alias in sending or receiving mail is one that society is prepared to recognize as reasonable."[99] The *Pitts* court further explained:

> Indeed a sender of mail might wish to remain completely anonymous for
> any number of reasons. The Supreme Court has held that anonymity of an

---

[94] R. Doc. 251 at 6.
[95] *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992) (citing *United States v. Jacobsen*, 466 U.S. 109 (1984); *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970); *Ex Parte Jackson*, 96 U.S. 727, 733 (1878)) (alteration in original).
[96] *Id.* (citations omitted).
[97] *Id.* (citing *United States v. Richards*, 638 F.2d 765, 770 (5th Cir. 1981); *Pierce II*, 959 F.2d at 1303 n.11 (drawing the distinction between packages addressed to the 'alter ego' of a defendant, and those addressed to individuals other than the defendant)).
[98] R. Doc. 240-1 at 12.
[99] *United States v. Pitts*, 322 F.3d 449, 459 (7th Cir. 2003).

author is not a sufficient reason to exclude literary works or political advocacy from the protections of the First Amendment. As the Court noted there, an author may decide to remain anonymous for fear of economic or official retaliation, out of concern for social ostracism, or merely because of a desire to preserve as much of one's privacy as possible. So too with the sender or receiver of mail.[100]

In opposition to Thompson's pretrial motion, the Government, citing *United States v. Daniel*, 982 F.2d 146 (5th Cir. 1993), argued, "Where a defendant has used an alias in furtherance of a criminal enterprise, that defendant sheds his reasonable expectation of privacy."[101] As the Government notes, the Fifth Circuit panel in *Daniel* stated, "[E]ven if we accept the Government's assertion that 'Lynn Neal' was Daniel's alias, we still question whether Daniel would have Fourth Amendment 'standing' to assert the claim, particularly when the use of that alias was obviously part of his criminal scheme."[102] Nevertheless, there are serious reasons to call the Government's reliance on this statement into question.

First, as Judge Vance explained in *United States v. Bogen*:

Before *Daniel*, the Fifth Circuit reiterated in *United States v. Villarreal*, that individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names. Although *Daniel* subsequently suggested that the court "question[s]" whether a defendant would have a legitimate expectation of privacy in a package addressed to an alias when the alias was obviously part of a criminal scheme, this was *dicta* and is not controlling. Further, as a general rule in the Fifth Circuit, "one panel may not overrule the decision of a prior panel . . . in the absence of an intervening contrary or superseding decision by [the] court sitting en banc or by the United States Supreme Court." And "where two previous holdings . . . conflict, the earlier opinion controls and is binding.[103]

---

[100] *Id.* at 458 (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-43 (1995)).
[101] R. Doc. 80 at 6.
[102] *Daniel*, 982 F.2d at 149 (citing *United States v. Lewis*, 738 F.2d 916, 919-20 n.2 (8th Cir. 1984)).
[103] *United States v. Bogen*, 2017 WL 497756, at *3 (E.D. La. Feb. 7, 2017) (alterations in original) (internal citations omitted). *See also Pitts*, 322 F.3d at 458 ("Similarly, in *Daniel*, the defendant disavowed the package in question, consistently claiming he was not the addressee. It was the government that claimed the name on the label was an alias for the defendant. The court did no more than raise the question of whether the defendant would have standing to assert a claim given that the use of an alias was part of his criminal scheme. This questioning was *dicta*, however, because the court went on to analyze the claim by assuming that the defendant had a legitimate expectation of privacy, ultimately finding that a warrant to

Second, as the Seventh Circuit articulated in *Pitts*, a finding that a defendant does not have a reasonable expectation of privacy in a letter or package that he sent using an alias *because* he used the alias as part of his criminal scheme raises serious constitutional concerns:

> Under [this] approach, only criminals forfeit their Fourth Amendment rights. The illegal contents of the package serve as an after-the-fact justification for a search. The concurrence concludes that society is not prepared to accept as reasonable an expectation of privacy in crack cocaine sent through the United States mail by a sender using a fictitious name for himself and his addressee. Of course, the government did not know the package contained crack cocaine until it opened and inspected the box. We may not justify the search after the fact, once we know illegal activity was afoot; the legitimate expectation does not depend on the nature of the defendant's activities, whether innocent or criminal. If this were the case, then the police could enter private homes without warrants, and if they find drugs, justify the search by citing the rule that society is not prepared to accept as reasonable an expectation of privacy in crack cocaine kept in private homes. Presumably if no narcotics are found (or, as the concurrence speculates, no pipe bombs are found), the owner of the home would be able to bring a civil lawsuit for nominal damages for the technical violation of privacy rights. The Fourth Amendment requires more than this.[104]

The Government also cites *United States v. Johnson*, 584 F.3d 995, 1001-02 (10th Cir. 2009) in support of its argument that courts have found a defendant does not have standing in situations in which the defendant used a fictitious name in furtherance of a criminal scheme.[105] However, the *Johnson* court, in reaching its decision, explicitly distinguished *Villarreal*:

> While some courts have found an expectation of privacy when an individual uses an alias or pseudonym, *see, e.g., United States v. Villarreal*, 963 F.2d

search the package was properly issued. *Daniel*, 982 F.2d at 149–52. Other cases in the Fifth Circuit clearly hold that individuals have a reasonable expectation of privacy in packages addressed to them under fictitious names even when the false names are used to distance the sender or recipient from the criminal nature of the contents of the package. See *Villarreal*, 963 F.2d at 774; *Richards*, 638 F.2d at 770. Thus, the defendants are correct that *DiMaggio* and the *dicta* in *Daniel* conflict with well-settled law in the Fifth Circuit.").

[104] *Pitts*, 322 F.3d at 458-59 (internal citations omitted).

[105] R. Doc. 80 at 7.

> 770, 774 (5th Cir. 1992) . . . , such a situation is distinguishable because it is not necessarily illegal to use a pseudonym to receive mail unless fraud or stolen identification is involved. Here, however, stolen identification was clearly involved. And because of the potential harm to innocent third parties, there is a fundamental difference between merely using an alias to receive a package and using another's identity.[106]

In this case, no stolen identification is involved.

The Government further argues that, even if a person who sends a package under an alias generally has an objective expectation of privacy in the package, Thompson abandoned any interest in this package "because he did not take any steps to assert control or ownership over the package."[107] It is true that a person does not have a reasonable expectation of privacy in an item once it has been abandoned.[108] "The test for determining when an object has been abandoned is one of intent, which 'may be inferred from words spoken, acts done, and other objective facts.'"[109]

The Government argues that in both *Villarreal* and *Pitts*, the courts paid close attention to whether the defendant had abandoned the package in question. In *Villarreal*, the Fifth Circuit held that the defendants had standing to object to the search but only after the court found that the defendants never disassociated themselves from the object of the search, never denied their possessory interest in the containers, "consistently acted as if they were the ones who were to receive" the containers, and "retained possession of the receipt for the [containers], which was the only indication of ownership available."[110] In *Pitts*, although the Seventh Circuit found that senders using an alias may have a reasonable privacy interest in a package sent in the mail, the court found the defendants

---

[106] *Johnson*, 584 F.3d at 1002.
[107] R. Doc. 97 at 2. *See also* R. Doc. 104 at 1-3.
[108] *See United States v. Barlow*, 17 F.3d 85, 88 (5th Cir. 1994) (citations omitted).
[109] *Id.* (quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973) (en banc)).
[110] *United States v. Villarreal*, 963 F.2d 770, 775 (5th Cir. 1992).

lacked standing because they had "abandoned the parcel."[111] In *Pitts*, the package at issue was sent using an alias as the sender and addressed to an alias.[112] The *Pitts* court found that at the time the warrant was issued, the intended recipient of the package, Alexander, had abandoned the package by expressly disavowing the package and refusing to accept its delivery even though he was the only resident of the home to whom the package was addressed.[113] The *Pitts* court also found that Pitts, the sender of the package, had abandoned the package when "[h]e launched the package into the stream of mail without any legitimate way of retrieving it."[114] The *Pitts* court explicitly reasoned, "Because he sent it via Express Mail and used a false return address, he acknowledges he would have been required to produce a copy of the mailing label and proper identification in the name of the sender in order to retrieve the package."[115] Courts interpreting *Pitts* have reasoned:

> In responding to the concurrence, however, the majority emphasized that the expectation of privacy was not forfeited by either defendant simply because they used fictitious names and addresses. Rather, the majority opined that Fourth Amendment rights are only surrendered in such a case when the package is actually abandoned, such as where the sender uses a false return address *and* the recipient refuses to accept delivery.[116]

Although Thompson, like Pitts, used an alias when he mailed the package, Thompson used a real name for the recipient, put his own cell phone number[117] on the package under the sender information, and remained in contact with the intended recipient following the shipment. The recipient did not disavow, but instead, received and opened the package. As a result, the package in this case was never abandoned. If Lirette

---

[111] *United States v. Pitts*, 322 F.3d 449, 459 (7th Cir. 2003).
[112] *Id.* at 451.
[113] *Id.* at 456.
[114] *Id.*
[115] *Id.* at 457.
[116] *United States v. Williams*, 2012 WL 6936619, at *4 (W.D. Tenn. Dec. 3, 2012) (citing *Pitts*, 322 F.3d at 459) (emphasis in original).
[117] The cell phone number was registered to "Rio Thompson", an alias of Philips Thompson.

had refused delivery of the package prior to the search, Thompson might have been found to have abandoned the package given that he would have no legitimate way to retrieve the undelivered package. The Court finds that, given the testimony at trial that Thompson sent and tracked the package and Lirette received and opened the package, Thompson did not abandon the package and thus he has satisfied the objective prong of the standing analysis. As a result, the Court, after reconsidering its June 27, 2016 Order and Reasons,[118] now finds that Thompson has standing to challenge the search of the package under the Fourth Amendment.[119]

### 3. Kerry Lirette, Jr. Has Standing to Challenge the Search of the Package Under the Fourth Amendment.

As the Court found in its June 27, 2016 Order and Reasons, Lirette has standing to challenge the search as it is uncontested he was the listed recipient of the package at issue.[120]

### E. Constitutionality of the Search

As Thompson and Lirette have standing, the Court must now consider the constitutionality of the search of the package. Thompson and Lirette argue that new evidence introduced at trial, namely the testimony of the UPS Store Owner Patricia Tarango, warrants suppression of all evidence gathered as a result of the UPS Store owner's warrantless search of the package.[121]

---

[118] R. Doc. 118.
[119] The Government waived its objection to Thompson's standing by introducing evidence at trial that Thompson mailed the package and arguing that theory to the jury. *See Steagald v. United States*, 451 U.S. 204 (1982); *United States v. Galan*, 19 F.3d 15, 1994 WL 93281 at *1 n.2 (5th Cir. 1994). *United States v. Morales*, 737 F.2d 761, 763 (8th Cir. 1984).
[120] R. Doc. 118 at 14-15 (explaining that the Government does not challenge that Kerry Lirette has standing and counsel for Lirette has acknowledged that his client, was in fact, the named recipient of the package).
[121] R. Docs. 240 at 1, 264 at 1.

If government agents open containers sent by mail or private carrier, they must satisfy the requirements of the Fourth Amendment.[122] The Fourth Amendment proscribes only governmental action.[123] As the Fifth Circuit explained in *Villarreal*, "[I]t is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official."[124] However, "[t]he Fourth Amendment can be violated by a search conducted by a private party acting as an agent or instrument of the government."[125] Although the Court, in its June 27, 2016 Order and Reasons, rejected Lirette's contention that the UPS store owner who opened the package was acting as a government agent, Thompson and Lirette argue that new facts introduced at trial, namely the testimony of the UPS store owner, Patricia Tarango, demonstrated that she was acting as an agent for the Government at the time of the search.

As the Court explained in its June 27, 2016 Order and Reasons[126]:

> The Fifth Circuit on several occasions has applied the Ninth Circuit's test to determine whether a private party is acting as an agent or instrument of the government.[127] The Ninth Circuit has identified two factors critical to determining whether a private party is an instrument or agent of the government: "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends."[128]

---

[122] *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992).

[123] *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). *See also Villarreal*, 963 F.2d at 774 ("Of course, common carriers do not violate the Fourth Amendment if they search the packages of others, whether or not they have authority to do so, since the amendment protects only against unreasonable government action.").

[124] *Id.* (internal quotation marks omitted).

[125] *United States v. Pierce ("Pierce I")*, 893 F.2d 669, 673 (5th Cir. 1990). *See also Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971).

[126] R. Doc. 118 at 16-18.

[127] *See, e.g., United States v. Blocker*, 104 F.3d 720, 725 (5th Cir. 1997); *Pierce I*, 893 F.2d 669, 673–74; *United States v. Bazan*, 807 F.2d 1200, 1202–04 (5th Cir. 1986).

[128] *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982). *See also United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981).

The movant has the burden to establish both factors in order to show the private party acted as a government agent or instrument.[129]

With respect to the first factor, "de minimis or incidental contacts between the citizen and law enforcement agents . . . will not be subject to Fourth Amendment scrutiny."[130] Courts have "required evidence of more than mere knowledge and passive acquiescence by the Government before finding an agency relationship."[131] There must be some evidence of government participation in or affirmative encouragement of the private search before the court will apply the Fourth Amendment to it.[132] "In some affirmative way, the police must instigate, orchestrate, encourage or exceed the scope of the private search to trigger application of the Fourth Amendment."[133] The defendant must come forward with evidence that "signal[s] affirmatively that the Government would be a ready and willing participant in an illegal search."[134]

In *United States v. Walther*, the Ninth Circuit recognized that "there exists a 'gray area' between the extremes of overt governmental participation in a search and the complete absence of such participation."[135] The resolution of cases that fall within this "gray area," the court explained, should be resolved on a case-by-case basis.[136]

One case that fell within the "gray area" is *United States v. Gudal*.[137] In *Gudal*, a police informant overheard the defendant boast about his marijuana plants growing on his property.[138] Before notifying the police, however, the informant entered the defendant's property to confirm the presence of marijuana.[139] He cut a lock on a barn on the defendants' property and detected a strong smell of growing marijuana and a bright light, indicating the defendant was indeed growing marijuana.[140] The informant then told the police, who confirmed the defendant resided on the property and that the defendant's high electricity usage was consistent with the running of many Halide lamps.[141] The Ninth Circuit affirmed the district

---

[129] *See Miller*, 688 F.2d at 657–58; *Pierce I*, 893 F.2d 669, 673–74; *United States v. Jarrett*, 338 F.3d 339, 345 (4th Cir. 2003); *United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir. 2003); *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987).
[130] *Miller*, 688 F.2d at 657.
[131] *Jarrett*, 338 F.3d at 345.
[132] *Id. See also Miller*, 688 F.2d at 657; *Walther*, 652 F.2d at 791–92.
[133] *United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996) (citing *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985), *cert denied*, 474 U.S. 1034 (1985)).
[134] *Jarrett*, 338 F.3d at 347.
[135] *Walther*, 652 F.2d at 791.
[136] *Id.*
[137] *United States v. Gudal*, 980 F.2d 739, 1992 WL 354551 (9th Cir. 1992).
[138] *Id.* at *1.
[139] *Id.*
[140] *Id.*
[141] *Id.*

court's denial of the defendant's motion to suppress.[142] The Ninth Circuit explained that the informant was not acting as a government agent or instrument at the time of his search of the defendant's property.[143] The Ninth Circuit found it relevant that the district court determined "the police had no prior knowledge of the informant's detective work and had done nothing to encourage that kind of activity. In fact, the contract with the informant expressly stated that he was to do no such thing."[144] The Ninth Circuit also noted that the informant "had never done anything like this before, and there was no evidence to show that he was emboldened by any assurance that his picaresque activities would be overlooked."[145] The court concluded that the police did not engage in any wrongdoing, as "[t]hey did not directly or indirectly cause the intrusion upon [the defendant's] property. That they were made aware of [the defendant's] own illegal activity as a result of someone else's does not justify suppression of this evidence."[146]

Prior to ruling on the pre-trial motions to suppress in this case, the Court, on May 4, 2016, held a suppression hearing during which Detective Heidi Hague, a Detective with the San Bernardino County Sheriff's Department ("SBCSD"), who was previously assigned to the parcel interdiction team; Agent John Traverse, a special agent with the Drug Enforcement Administration; and Sergeant Audomero Moreno, a Deputy Sheriff with the SBCSD, testified regarding the facts surrounding the search of the package at issue.[147] The Government did not call Ms. Tarango or Deputy Kristina Winegar, a Deputy Sheriff with the SBCSD who was part of the parcel interdiction team involved in the investigation of the package at issue, as witnesses at the suppression hearing. Based on the testimony and evidence introduced at the suppression hearing, the Court found that Lirette had failed to establish that the Government knew of and acquiesced in the intrusive conduct of the UPS store owner.[148] Specifically, the Court found:

---

[142] *Id.* at *2–3.
[143] *Id.*
[144] *Id.* at *2.
[145] *Id.* at *3.
[146] *Id.*
[147] Minute Entry, R. Doc. 105; Transcript R. Doc. 240-3.
[148] R. Doc. 118 at 18.

According to Officer Winegar's report, a UPS employee informed her that "the box was open due to UPS policy."[149] UPS's policy provides in relevant part: "UPS reserves the right in its sole discretion to open and inspect any package tendered to it for transportation."[150] Detective Hague testified unequivocally at the suppression hearing that prior to the search she instructed the UPS store owner not to open any packages and that doing so "would have been contrary to [her] directive."[151] There was no evidence that the sheriff's department knew the UPS store owner had ever opened packages she suspected contained drugs. Although Detective Hague testified that she paid the owner several times prior to the search of the package at issue,[152] Detective Hague also testified that the owner had not opened any of the ten parcels to which the UPS store owner previously alerted Detective Hague.[153] She also testified that the sheriff's department had no supervision over the owner, whom Detective Hague referred to as a "citizen informant."[154] Moreover, although the sheriff's department paid the UPS store owner $100 after the search of the package led to the three defendants' arrests[155] "[s]uch after-the-fact conduct cannot serve to transform the prior relationship between [the owner] and the Government into an agency relationship with respect to the search of [the package]."[156]

The evidence establishes the San Bernardino Sheriff's Department did not participate in or affirmatively encourage the UPS store owner's opening of the package.[157] Indeed, a UPS employee told Officer Winegar the package was opened pursuant to UPS's policy.[158] There was no indication to the San Bernardino Sheriff's Department that the UPS store owner had opened suspicious packages prior to notifying detectives on previous occasions. Thus, there was no acquiescence on part of the sheriff's department even though it paid the store owner for alerts relating to suspicious packages that were later discovered to contain narcotics.[159] Lirette has failed to provide evidence showing that the sheriff's department affirmatively was "a ready

---

[149] R. Doc. 106-3 at 3.

[150] R. Doc. 106-10 at 16.

[151] R. Doc. 240-3, at 19-20. ("Q. Have you instructed her not to open the packages? A. Yes, sir."). *See also id.* at 40 ("Q. Did you provide any directive regarding what to do when packages were seized or she suspected a suspicious package? A. Yes. Q. What were those instructions? A. To call me directly and to put the package in the area where—at the back of the store where they put the packages to be picked up at the end of the day and to not open the package."); *id.* at 47 ("Q. And you also told her very clearly that she was not to open the packages on her own, correct? A. Yes, sir.").

[152] *Id.* at 22.

[153] *Id.* at 19 ("Q. And based upon your report, you personally seized ten of those parcels? A. Yes. Q. How many of those ten contained narcotics? A. All ten, sir. Q. Had she opened the packages? A. No, sir.").

[154] *Id.* at 15–16, 41.

[155] *See* R. Doc. 106-9.

[156] *See United States v. Jarrett*, 338 F.3d 339, 345 (4th Cir. 2003).

[157] *See United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982); *United States v. Walther*, 652 F.2d 788, 791-2 (9th Cir. 1981).

[158] R. Doc. 106-3 at 3.

[159] *See United States v. Gudal*, 980 F.2d 739, 1992 WL 354551 (9th Cir. 1992). (finding relevant that the informant "had never done anything like this before, and there was no evidence to show that he was emboldened by any assurance that his picaresque activities would be overlooked").

and willing participant in an illegal search."[160] Accordingly, the evidence fails to establish that the government knew of and acquiesced in the intrusive conduct, and the Court need not reach the second factor.[161]

    1. **Evidence at Trial Established the San Bernardino County Sheriff's Department Knew of and Acquiesced in Ms. Tarango's Practice of Opening Suspicious Packages Without a Warrant.**

The first prong of the two-part test for determining whether a private party is a government actor under the Fourth Amendment is did the government know or acquiesce in the intrusive conduct.[162]

Ms. Tarango's testimony at trial seriously calls into question Detective Hague's testimony at the pretrial hearing. At trial, Ms. Tarango testified that she has been contacting the SBCSD since she and her husband first opened their UPS store, ten years ago.[163] During those ten years, Ms. Tarango estimated that she and her husband identified approximately one package per month they suspected contained drugs, or, one hundred and twenty packages during their tenure as owners of the store.[164] Ms. Tarango also testified that she opened any package she suspected contained drugs "ninety-nine percent of the time."[165]

Contrary to Detective Hague's testimony at the suppression hearing, Ms. Tarango testified that the SBCSD was aware it was her practice to open the packages. Ms. Tarango explicitly explained, "It was always understood that I had opened the package. I always

---

[160] *See Jarrett,* 338 F.3d at 347.

[161] R. Doc. 118 at 18-20.

[162] *See United States v. Grimes,* 244 F.3d 375, 383 (5th Cir. 2001) (citing *United States v. Paige,* 136 F.3d 1012, 1018 (5th Cir. 1998)).

[163] R. Doc. 235 at 6 (Trial Testimony of Patricia Tarango).

[164] *Id.* at 7.

[165] *Id.* at 17. *See also id.* at 18 ("Q: And so 99 percent of the time when those deputies have come, you've already opened the package and you generally open it at the bottom, correct? A: That's correct."); *id.* at 20 ("A: I open every drug package that has come into my store"); *id.* at 26 ("That's why I opened not only that package, but every package – drug package that came through my store.").

made it clear that I – I would always make sure and tell [law enforcement] that I had opened the package."[166] Ms. Tarango's testimony that SBCSD knew she routinely opened the packages before notifying law enforcement was corroborated, at least to some extent, by Deputy Winegar's testimony at trial that she was aware Ms. Tarango "sometimes" opened packages.[167]

Ms. Tarango also testified that SBCSD did nothing to stop her from continuing to open packages despite knowing that she routinely opened the packages prior to contacting the department. When asked if the SBCSD deputies ever told her to stop opening packages, Ms. Tarango testified, "If anything, they said they didn't recommend it. They said – in fact, I remember one of them saying, 'This is your store. We can't tell you what to do or what not to do, but we don't recommend it.'"[168]

The Court further finds it significant that Mr. Tarango testified that SBCSD came to the store the first week it was opened and presented Ms. Tarango and her husband "with a flyer on things to look for illegal packages" and about a "half-a-dozen pointers [on what] to look for" when discerning whether a package may contain drugs.[169] Although Ms. Tarango testified that the SBCSD "did share with us that they didn't recommend that we open packages," Ms. Tarango also explained that SBCSD told her and her husband that "it was our store to do with what we wanted to and they realized that."[170] Ms. Tarango

---

[166] *Id.* at 19. *See also id.* at 18 ("Q: And so 99 percent of the time when those deputies have come, you've already opened the package and you generally open it at the bottom, correct? A: That's correct.").

[167] R. Doc. 234 at 35-36 (Trial Testimony of Kristina Winegar) ("Q: And to be fair to everybody, Ms. Tarango slit open the bottom of the box before she called you, right? A: Yes, she did. Q: And she would open these boxes every time before she called you, right? A: Sometimes she would, sometimes she wouldn't.").

[168] R. Doc. 235 at 18 (Trial Testimony of Patricia Tarango). *See also id.* at 16 ("Q: You mentioned that the police in San Bernardino recommended that you not open the package? A: Correct. Q: Isn't it true that [SBCSD] directed you not to open the package? A: No, that is not correct.").

[169] *Id.* at 7.

[170] *Id.*

also testified that SBCSD told her they would compensate her for reporting suspicious packages.[171]

The Government, citing *Blocker*, maintains Ms. Tarango's testimony at trial that the SBCSD was aware she routinely opened suspicious packages should not change the Court's analysis with respect to the first prong of this inquiry.[172] The Government argues that Fifth Circuit case law holds that when the government has not encouraged a citizen to perform a search, and has deferred to the citizen's own judgment, there is no Fourth Amendment search.[173]

First, courts have held that the government's actions may satisfy the knowledge-and-acquiescence test when the Government knew the citizen had engaged in these types of searches in the past, did not discourage the citizen from continuing to do so, and encouraged the citizen to continue the searches by rewarding the citizen for providing drug-related information in the past.[174] It is not necessary that a citizen expect payment for notifying law enforcement regarding contraband found during the search at issue, but it is material that law enforcement has rewarded the citizen in the past in the form of payments for information.[175]

Second, the facts in *Blocker* are distinguishable from this case. In *Blocker*, the Fifth Circuit, applying the two prong test for whether a private party acted as an instrument or agent of the Government when he conducted the search in question, found that a state

---

[171] *Id.* ("Q: Did they ever – I guess did they ever compensate you for reporting suspicious packages? A: They did. They brought that up. They said that per package we would receive $50."). Although Ms. Tarango testified that she estimated she and her husband had reported at least one hundred and twenty drug packages, she stated that she and her husband were only compensated for a total of eight packages, or four hundred dollars. *Id.*

[172] *See* United States v. Blocker, 104 F.3d 720 (5th Cir. 1997).

[173] R. Doc. 251 at 17 (referencing *Blocker*, 104 F.3d 720).

[174] *See* United States v. Walther, 652 F.2d 788, 793 (9th Cir. 1981).

[175] *See id.* at 790, 793.

insurance examiner, Thomas Gober, was not a government actor under the Fourth Amendment.[176] The Fifth Circuit found that the scope of Gober's audit uncovering the illegal behavior of the defendant "was not in any way altered by his relationship with the FBI. Gober went onto AJL's premises unaccompanied by any state or federal agents, and inspected ALJ's records in a manner completely consistent with any routine MID audit."[177] The Fifth Circuit specifically found that "Gober did not use the audit to conduct a general search for incriminating materials [but] [i]nstead, his inspection was limited to the purposes contemplated by the [consenting] suspect."[178] The Fifth Circuit further explained:

> Gober's audit of ALJ would have been made at the same time and place, and in exactly the same manner and extent, had Gober not been also been acting for the FBI. The FBI did not implicitly or explicitly influence the course or form of Gober's examination. On the contrary, the FBI repeatedly told Gober to conduct his audit as he always had, emphasizing "that he was to do precisely that which he would do in the normal course of any examination, nothing more, nothing less, and nothing different." *At no time did the FBI direct Gober on what to do or look for while inspecting AJL's records.* Crucially, Gober's audit was an actual, regular MID audit and Gober looked in no place and at no document or thing, and discovered nothing, that he would not have looked in or at or discovered had he had no contact with the FBI.[179]

In *Blocker*, Gober's position as a state insurance examiner actually required that he search, or audit, other people's private information. While Ms. Tarango was permitted, pursuant to UPS policy, to search suspicious packages, this certainly was not required of her as owner of the store.

Almost every court discussing the standard to be applied when determining whether a private individual should be considered an instrument or agent of the

---

[176] *See* <u>Blocker</u>, 104 F.3d 720.
[177] *Id.* at 728.
[178] *Id.* (internal citations and quotations omitted).
[179] *Id.* (emphasis added).

government has explained that there is no bright-line rule and that a "court's analysis must be made on a case-by-case basis and in light of all the circumstances."[180] The facts found by the Court in this case are that the SBCSD instructed Ms. Tarango and her husband what to look for when attempting to identify packages that may contain illegal substances; the SBCSD entered a confidential agreement with Ms. Tarango whereby she agreed to assist the sheriff's department in the investigation of crimes and the sheriff's office considered her to be a citizen informant; the SBCSD compensated Ms. Tarango on a number of occasions for information she provided; and, finally, although SBCSD may have told Ms. Tarango that it did not "recommend" that she open packages prior to contacting law enforcement, the SBCSD was aware she was doing so and acquiesced in this practice. These facts do not describe *de minimis* or incidental contacts between Ms. Tarango and law enforcement. The Court, based on its findings of fact and the applicable law, holds that Thompson and Lirette have met their burden of establishing the first factor of the test to determine whether Ms. Tarango is an instrument or agent of the government.

---

[180] *See, e.g., United States v. Koenig*, 856 F.2d 843, 847 (1st Cir. 1988) (quoting *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987). In *Koenig*, the Seventh Circuit explained that the two "critical factors" in the analysis are those articulated are whether the Government knew of and acquiesced in the intrusive conduct and whether the private party's purpose for conducting the search was to assist law enforcmenet or to further [its] own ends. *See id.* As the Seventh Circuit also identified in *Koenig*, the Ninth Circuit in *Walther* "expressly disavowed setting forth a specific formula for determining whether [a private citizen] could be considered an 'instrument or agent' of the government, and stressed that the determination must be made on a case-by-case basis." *Id.* (citing *Walther*, 652 F.2d at 791). Although the Fifth Circuit has continually used these same "critical factors" as its test in analyzing the "instrument or agent" issue, the Fifth Circuit has also never expressly stated that this test is a rigid, bright-line rule. For example, in *Blocker*, the Fifth Circuit, in citing the two element test, explained that it has always "assumed that the Ninth Circuit's test was an adequate formulation." *Blocker*, 104 F.3d at 725. Similarly, in *Pierce I*, the Fifth Circuit, explained, "For purposes of reviewing Pierce's argument we will once against assume the adequacy of this formulation." *United States v. Pierce*, 893 F.2d 669, 673 (5th Cir. 1990) ("*Pierce I*").

## 2. Ms. Tarango was Motivated by a Desire to Assist Law Enforcement.

The second prong of the two-part test for determining whether a private party is a government actor under the Fourth Amendment is whether the private party intended to assist law enforcement efforts or to further his or her own ends.[181]

The Court did not address this prong in its June 27, 2016 Order and Reasons after finding that Lirette could not establish the government knew and acquiesced in Ms. Tarango's practice of opening packages. At the May 4, 2016 suppression hearing, Detective Hague testified that Ms. Tarango's motivation in agreeing to be an informant for SBCSD was that "[s]he was afraid that either a UPS driver would mis-deliver [sic] the package or it would get lost somewhere in the shuffle and the last place that the package would be, if it were tracked online, would be her store."[182]  Specifically, Detective Hague testified that Ms. Tarango told her she was afraid that "a drug dealer would come back to her store looking for [the] package and her safety would be in question."[183]

At trial, Ms. Tarango testified that she did not recall telling Detective Hague that she was afraid a drug dealer would come to her store looking for a package and, as a result, her safety would be jeopardized.[184] Instead, when asked why she reported drug packages to law enforcement, Ms. Tarango testified at trial, "Number 1, . . . for the safety of my

---

[181] *See* United States v. Grimes, 244 F.3d 375, 383 (5th Cir. 2001) (citing United States v. Paige, 136 F.3d 1012, 1018 (5th Cir. 1998)).

[182] R. Doc. 113 at 27 (Suppression Hearing Testimony of Heidi Hauge).

[183] *Id.*

[184] R. Doc. 235 at 27-28 (Trial Testimony of Patricia Tarango) ("Q: Didn't you tell Heidi Hague that you were afraid of a mix up of a drug package and that it would be lost or misdelivered and that that would come back on you? A: No, I don't remember telling Heidi that. Q: Could you have said that? A: I don't . . . remember saying that. Against, I do not remember saying that. . . . Q: Did you express that sentiment to her even though she may not have used those words verbatim? A: I don't remember that. Q: Could have, you just don't remember today? A: I don't' remember saying that to her. Q: And I don't' mean to beat a dead horse here, but are you saying that you did not express that to Heidi Hague or that you could have but you don't remember. A: I don't remember saying that to Ms. Hague.").

employees; and No. 2 because it was the right thing to do."[185] Thompson and Lirette argue that Ms. Tarango's admission that she opened the packages, at least in part, because helping police apprehend drug dealers was "the right thing to do" establishes that she intended to assist law enforcement. This conclusion, they argue, is corroborated by both the terms of the confidential agreement she signed – in which she agreed to "assist the San Bernardino County Sheriff's Department in the investigation of crime and criminal activity in the County of San Bernardino,"[186] and by her previous statements that appear in law-enforcement reports prepared by the Government.[187] Further, Thompson and Lirette argue Ms. Tarango's testimony was consistent with Deputy Winegar's trial testimony that "Ms. Tarango wants to do the right thing, she wanted to help law enforcement."[188]

In *Koenig*, the Seventh Circuit cautioned that, because the United States of America is a democracy in which individual citizens *are* the government, "it should come as no surprise when the goals of private individuals or organizations coincide with those of the government."[189] As a result, Ms. Tarango's testimony that she wanted "to do the right thing," if there was nothing more, may not have sufficed to show that she was acting with the intention of assisting law enforcement. In this case, however, the confidential agreement Ms. Tarango signed with the SBCSD, expressly states that Ms. Tarango agreed

---

[185] *Id.* at 8.
[186] R. Doc. 80-5.
[187] R. Doc. 80-7 at 2-3 ("Due to the fact that the owner wanted to protect her employees and the store, as well as 'do the right thing', and help law enforcement investigators take dangerous controlled substances off the street; the owner agreed to contact the SBCSD whenever a suspected drug parcel came through the store. The owner subsequently signed an agreement with the SBCSD and began calling the SBCSD whenever she came across a suspected drug parcel.").
[188] R. Doc. 234 at 44 (Tr. Testimony of Kristina Winegar).
[189] *United States v. Koenig*, 856 F.2d 843, 847 (1st Cir. 1988).

to assist law enforcement. The Court finds, as a matter of fact, that Ms. Tarango did have the intent to assist law enforcement efforts.[190]

The Court finds that Thompson and Lirette have met their burden of establishing that Ms. Tarango was acting as a government agent at the time of the search in question. Because the search was by a government agent without a warrant, is it presumptively impermissible.[191] The Government has not argued that any exceptions to the Fourth Amendment apply. The Court holds that all evidence stemming from the unconstitutional search of the package must be suppressed as to Thompson and Lirette.

## VI. Motions for Judgments of Acquittal or New Trials

### A. Philips Thompson

Philips Thompson filed a Motion for Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or in the alternative, a New Trial in accordance with Rule 33 of the Federal Rules of Criminal Procedure.[192] Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[193]

Because the Court has reconsidered Thompson's motion to suppress and granted the motion, the Court finds that the interests of justice require that Thompson be granted a new trial. Thompson's motion for a judgment of acquittal is denied.

### B. Akari Williams

Akari Williams also filed a Motion for Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or in the alternative, a New Trial in

---

[190] If Ms. Tarango had testified at trial that her only reason for the search was concern for the safety of her employees, it is likely the Court's finding of fact would be different.
[191] *United States v. Villarreal*, 963 F.2d 770, 773 (5th Cir. 1992).
[192] R. Doc. 240.
[193] FED. R. CRIM. P. 33(a).

accordance with Rule 33 of the Federal Rules of Criminal Procedure.[194] With respect to his motion for a judgment of acquittal, Williams argues the government presented no evidence that would allow a rational trier of fact to find him guilty of Count One, conspiracy to distribute and possession with the intention to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. § 846, or Count Three, possession with the intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A) and 18 U.S.C. § 2.[195] With respect to his motion for a new trial, Williams argues a new trial is warranted as a result of "a clear miscarriage of justice" that occurred and because the jury's verdict was based upon insufficient evidence.[196]

Williams provides no support for his contention that a new trial is warranted as a result of a clear miscarriage of justice other than his argument that the evidence, and the fruits thereof, obtained through the search of the package should have been suppressed. As explained above, Williams does not have standing to challenge the constitutionality of the search and as a result, this argument is meritless.

The remaining portion of Williams' post-trial motion is that he is entitled to either a judgment of acquittal or a new trial based on his belief that his guilty verdicts were not supported by the evidence. It is a defendant's burden to prove that a new trial or an acquittal is merited.[197] It is clear Williams cannot satisfy his burden as the jury's verdict was supported by evidence proving his guilt beyond a reasonable doubt.

In order to be convicted of Count One, conspiracy to distribute and possess with the intent to distribute 500 grams or more of methamphetamine, the jury was required

---

[194] R. Doc. 242.
[195] *Id.* at 2.
[196] *Id.* at 2-3.
[197] *United States v. Soto-Silva*, 129 F.3d 340, 343 (5th Cir. 1997).

to find that the Government proved the following beyond a reasonable doubt: (1) there was an agreement between two or more persons to distribute and possess with the intent to distribute 500 grams or more of methamphetamine; (2) the defendants knew of the conspiracy and intended to join it; and (3) that they voluntarily participated in the conspiracy.[198] In order to be convicted of Count Three, possession with the intent to distribute 50 grams or more of methamphetamine, the jury was required to find that the Government proved the following beyond a reasonable doubt: (1) Williams knowingly; (2) possessed 50 grams or more of methamphetamine; (3) with the intent to distribute it.[199] As the Court's instructions to the jury made clear, possession can be actual or constructive, joint among defendants, and established by direct or circumstantial evidence.[200] Count Three also charged aiding and abetting, which required proof of (1) Williams' association in the criminal activity; (2) his participation; and (3) his action to help the activity succeed.[201]

The evidence at trial clearly supports the verdicts of guilty as to Williams for Counts One and Three. At trial, Deputy Winegar testified regarding the seizure of a package from the UPS Store in Riverside, California, on May 27, 2014. Deputy Winegar testified that, after a positive alert by a narcotics K-9, she obtained a warrant and discovered that the package contained approximately three pounds of methamphetamine.[202] Deputy Winegar confirmed that she then sent the package to the Terrebonne Parish Sheriff's Office in Louisiana.[203] Lieutenant Ronald McKay of the Terrebonne Parish Sheriff's

---

[198] *See, e.g., United States v. Mitchell*, 484 F.3d 762, 768-69 (5th Cir. 2007).
[199] *See, e.g., United States v. Burton*, 275 F. App'x 332, 336 (5th Cir. 2008).
[200] R. Doc 216 at 21; *United States v. Martinez*, 190 F.3d 673, 676 (5th Cir. 1999).
[201] *United States v. Pedroza*, 78 F.3d 179, 183 (5th Cir. 1996).
[202] *See* Gov't Tr. Ex. 4 (seized methamphetamine).
[203] *See* Gov't Tr. Ex. 1 (photos of UPS Package).

Office ("TPSO") testified that he received the package sent by Deputy Winegar. He, along, with TPSO deputies Shelly Liner, Derek Collins, and Danielle LeBeouf described executing a controlled delivery of the package to Kerry Lirette at 332 Grace Street, on May 30, 2014. Lieutenant McKay testified that Lirette received the package from the undercover officer and then headed down the street to Akari Williams' residence at 313 Grace Street. Lieutenant Liner described how he was able to take photos of Lirette and Williams as they opened the package together.[204] A TPSO officer entered Williams' residence immediately thereafter and seized the drugs and detained the occupants in the home. During a search of 313 Grace Street, officers recovered an AK-style firearm[205], cash[206], and a digital scale.[207]

Task Force Agent Russell Hornsby testified regarding further steps taken in the investigation. He obtained a search warrant for Williams' cell phone[208] which showed communications between Williams and phone number (985)856-3749, [209] the same number listed under the name "Sam Niel" on the seized package of methamphetamine.[210] The communications between Williams and phone number (985)856-3749 included the tracking number of the intercepted package and the address to which the package was sent. Agent Hornsby obtained the subscriber information for (985)856-3749 and learned that the number was subscribed to "Rio Thompson,"[211] an alias, Agent Hornsby later learned, of Philips Thompson. Agent Hornsby then obtained a GPS ping order on this

---

[204] *See* Gov't Tr. Ex. 7 (photos from iPhone placed inside package for controlled delivery).
[205] Gov't Tr. Ex. 18.
[206] *See* Gov't Tr. Ex. 9 (photos of the search).
[207] Gov't Tr. Ex. 25.
[208] Gov't Tr. Ex. 5.
[209] Gov't Tr. Ex. 6A.
[210] Gov't Tr. Ex. 2.
[211] Gov't Tr. Ex. 13.

phone number and learned that the phone was located at the Los Angeles Airport on July 22, 2014. According to Southwest Airlines, Thompson was taking a flight to New Orleans on that date.[212] Agent Hornsby, along with DEA agents, then went to New Orleans Airport, intercepted Thompson, and seized his cell phone.[213] The phone number for the phone seized from Thompson corresponded to (985)856-3749.[214]

Law enforcement then conducted a forensic search of Thompson's cell phone.[215] Law enforcement discovered text messages with directions to deposit money into bank accounts corresponding to Thompson's and other individuals' accounts. The Government, through its expert, Robert Glenn, introduced evidence that the subpoenaed bank statements[216] established that these text messages were followed by deposits in south Louisiana banks and then withdrawals, shortly thereafter, in southern California, the same area from which the methamphetamine was mailed on May 27, 2014.[217]

Lucas Riley, a cooperating witness, also testified that he was present at 313 Grace Street on May 30, 2014, the day of the controlled delivery. Riley testified that he observed Lirette arrive at the house and that Lirette and Williams immediately went into the master bedroom alone with the package. Riley also testified that shortly thereafter, Lirette came out of the room, heading towards the bathroom, with the can containing the methamphetamine while Williams yelled, "Flush it!" Riley testified that TPSO officers entered the home before Lirette could dispose of the drugs.

---

[212] *See* Gov't Tr. Ex. 38.
[213] Gov't Tr. Ex. 11.
[214] Gov't Tr. Ex. 12A.
[215] *Id.*
[216] Gov't Tr. Exs. 30, 32.
[217] Gov't Tr. Exs. 31, 33, 34.

Another cooperating witness, Johnny Williams, testified that he received methamphetamine from Williams in the past. Williams also testified that he sold that methamphetamine to a confidential informant on October 31, 2013. Both Riley and Williams testified that Thompson and Williams worked together to sell methamphetamine and that they learned from Williams that Thompson would frequently fly to California to buy methamphetamine cheaply and mail it back to Houma.

The Government also presented evidence, through additional records found on Thompson's cell phone, that Thompson had texted other tracking numbers to Williams in the past. UPS and Federal Express records showed that these tracking numbers matched other packages mailed from the Los Angeles area to the Houma, Louisiana area.[218] The addresses shown in the records for these packages corresponded to addresses of Williams' family members and associates found on documents seized in Williams' residence on May 27, 2014.[219]

The Government also presented evidence that Thompson took other flights to the Los Angeles area during the period of the charged conspiracy and that Thompson frequently purchased tickets for the flights less than three days prior to the departure.[220] The testimony of DEA Special Agent Kelly Halliday confirmed that her review of Thompson's phone records, Southwest records, along with FedEx and UPS records, showed that his travels to the Los Angeles area corresponded to the dates the packages were mailed from southern California to the Houma area and the dates of the text messages Thompson sent to Williams containing the tracking numbers.[221]

---

[218] Gov't Tr. Exs. 37, 44.
[219] Gov't Tr. Exs. 23.
[220] Gov't Tr. Exs. 38, 38A-38G (Southwest records).
[221] Gov't Tr. Ex. 39.

Two DEA forensic analysts, Dr. William Kent Glanville and Paul Galat, testified regarding the methamphetamine seized from the package. Galat testified the methamphetamine from the package had a substance purity of 98.7% pure methamphetamine and that the methamphetamine sold by Johnny Williams to a confidential informant had a purity of 100% pure methamphetamine. The Government argued that the similar level of purity of the two packages corroborated Johnny Williams' testimony that he received the methamphetamine he sold to the confidential informant from Akari Williams.

Based on the above described evidence introduced at trial, the evidence clearly established that Akari Williams was engaged in an ongoing conspiracy with Philips Thompson in which Thompson would fly to California and mail packages containing methamphetamine to Williams' associates in southern Louisiana. The evidence clearly showed the conspiracy involved at least 500 grams of methamphetamine as the package that was intercepted in California contained over a kilogram of methamphetamine that was 97% pure. Because the jury's verdicts as to Akari Williams were entirely consisted with and supported by the evidence, the Court finds Akari Williams has not met his burden and accordingly, his Motion for Judgment of Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, or in the alternative a Motion for a New Trial in accordance with Rule 33 of the Federal Rules of Criminal Procedure[222] must be denied.

## CONCLUSION

Philips Thompson's Renewed Motion to Suppress and for Judgment of Acquittal or New Trial is **GRANTED** in part and **DENIED** in part. The guilty verdict with respect

---

[222] R. Doc. 242.

to Philips Thompson is vacated and Philips Thompson is granted a new trial. The evidence from the May 27, 2014 package search, and the fruits thereof, are suppressed and shall not be entered into evidence at his new trial. Philips Thompson's motion for a judgment of acquittal is denied.

Akari Williams Motion for Judgment of Acquittal and/or New Trial is **DENIED**.

Kerry Lirette's Motion to Reconsider the Court's Ruling on the Motion to Suppress Evidence is **GRANTED.** The evidence from the May 27, 2014 package search, and the fruits thereof, are suppressed and shall not be entered into evidence at his trial.

**New Orleans, Louisiana, this 11th day of December, 2017.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**